UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JENIFER WAHL,<br><br>Defendant. | 5:23-CR-50013-KES<br><br><br>REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS EVIDENCE (DOC. 32) |

Jenifer Wahl filed a Motion to Suppress Evidence (Doc. 32) and memorandum in support of her motion (Doc. 34).  The United States filed a response in opposition to the motion.  (Doc. 36).

A hearing was held on Wednesday, October 4, 2023.  Wahl was personally present and represented by her attorney of record, Jordan Bordewyk.  The Government was represented by the Assistant United States Attorney, Kathryn Rich.  Wahl submitted supplemental briefing on December 4, 2023.  (Doc. 51).

Based on a careful consideration of all the evidence and counsel's arguments, the Court respectfully recommends that Wahl's Motion to Suppress (Doc. 32) be denied.

## JURISDICTION

Wahl is charged in an Indictment with Conspiracy to Distribute Controlled Substances in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B) &(C) and Prohibited Person in Possession of Firearm in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). (Doc. 1). The pending motions were referred to the Magistrate Judge pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B) and United States District Court District of South Dakota's local rules, LR 57.11(B).

## FACTUAL BACKGROUND

In late 2021, or early 2022, Unified Narcotics Enforcement Task Force (UNET) personnel received information from sources of information that Amanda Vu ("Vu") was a source of supply for illegal drugs, specifically methamphetamine. (Doc. 44, pp. 5-6). UNET conducted electronic surveillance on Vu's residence, electronic tracking surveillance, physical surveillance, and precision interdiction stops on Vu. Id. at p. 6. UNET requested a search warrant for Vu's Facebook for the dates of January 1, 2022, to May 25, 2022. Id. at p. 11. In June 2022, law enforcement received the return from Facebook of the contents of Vu's account.[1] Id. at p. 7.

Within the Facebook records was a conversation between Vu and Jenifer Wahl. Id. at pp. 10 & 13-15; Exhibit 4. Ryan Gebhard, a detective with the Rapid City Police Department assigned to UNET, testified[2] that he "observed a

---

[1] Detective Gebhard testified that law enforcement verified that the account belonged to Vu. (Doc. 44, pp. 7 & 12).
[2] The court finds Detective Gebhard's testimony to be credible.

conversation between the two individuals that [was] indicative of the distribution of illegal drugs," starting since at least January 7, 2022. Id. at pp. 14-15. In the messages, they discussed meeting up, cutting product, and payments. Id. at pp. 15-24. At one point in the conversation, Wahl asked Vu for a price break, Vu referred to her "bench"[3] being off, and the two discussed other topics indicative of drug activity. Id. at p. 24.

In June 2022, Detective Gebhard told[4] Detective James Olson,[5] a Deadwood Police Investigator, that he noticed multiple conversations between Vu and Wahl. Id. at pp. 25 & 90. Detective Gebhard told Detective Olson that the conversations indicated that the duo was meeting in the Lead/Deadwood area. Based on the detective's conversation, Detective Olson began his investigation into Wahl. Id.

Detective Olson testified[6] that he sought a search warrant for Wahl's Facebook account in July 2022. In August 2022,[7] he received the requested information from Facebook. Id. Detective Olson observed seven or eight communications that were very apparent that the nature of those conversations had to deal with the sale and distribution of drugs. Id. at p. 91.

---

[3] Detective Gebhard testified that bench is slang for a digital scale.
[4] Detective Gebhard relayed the Facebook messages to Detective Olson, as it appeared Wahl lived in the Deadwood area.
[5] Detective Olson testified he is assigned to UNET's north branch. Id. at p. 88.
[6] The court finds Detective Olson's testimony to be credible.
[7] Detective Olson initially stated he did not receive the return from Facebook until October 2022; however, on re-direct examination he stated he looked at the wrong report and the return from Wahl's Facebook came in August of 2022. Id. at p. 189. Detective Olson confirmed he had the information from the content of her Facebook before the October 2022, traffic stop. Id.

In those conversations, Detective Olson believed that Wahl was the one selling cocaine, methamphetamine, and marijuana.  Id.

Based on the information that was shared by Detective Gebhard and the information learned from Wahl's Facebook account, Detective Olson applied for a search warrant, from the State of South Dakota, for an electronic tracking device to be placed on Wahl's vehicle, a Toyota Sienna minivan; the search warrant was granted, and the tracking device was placed.  Id. at p. 93.  Prior to applying for the search warrant for the electronic tracking device, Detective Olson conducted physical surveillance on Wahl's address.  Id.  Detective Olson was able to confirm that her vehicle was a Toyota Sienna minivan.[8]  Id.

On September 11, 2022, a tracking device on Vu's car indicted that shortly after midnight, [in the] early morning hours, Ms. Vu's vehicle traveled down to Torrington, Wyoming.  After spending a short amount of time there, it traveled back to South Dakota, straight to the Lead area, specifically 300 Aspen Court, which was later discovered to be the parking lot for the apartment building that Wahl lives in.  Id. at p. 25.  It was believed that Vu was driving to Torrington to meet with her source of supply.  Id. at p. 26.

On October 17, 2022, in the early morning hours, agents became aware that Vu's Nissan Titan was traveling to Deadwood.  Id. at p. 26.  Detective Gebhard contacted Detective Olson to informed him that Vu headed towards the Lead/Deadwood area.  Id. at p. 94.  Detective Olson then pulled up Wahl's

---

[8] This Sienna minivan was registered to Wahl.

tracker information, which "showed her en route from Lead towards Deadwood." Id.

Law enforcement officers involved in this case were briefed on information regarding the individuals involved, the vehicles associated, where the individuals may live, where they may go, and the plan of whether law enforcement was going to stop the Sienna based off the totality of the investigation or if law enforcement was to develop reasonable suspicion to stop the vehicle. Id. at pp. 33 & 48.

The tracking device on Vu's Titan and Wahl's Sienna indicated that they were in the Super 8's parking lot at approximately 10:16 a.m. Id. at p. 36. No law enforcement officer observed these vehicles in the Super 8 parking lot, confirmed who the drivers of the vehicles were, or confirmed whether the drivers met with each other. Id. The tracking data showed Wahl then traveled to the area near the Wells Fargo. See Exhibit 5. [9]

Detective Olson saw that Wahl's electronic tracking device indicated that she was in the area of the Wells Fargo parking lot in Deadwood. (Doc. 44, p. 95). Based on that information, Detective Olson drove, in an unmarked unit, and parked on the south end of the Wells Fargo parking lot, facing north. Id. at pp. 95-97. Detective Olson saw Wahl coming from the area of the Franklin Hotel and get into her vehicle. Id. at p. 97. The Sienna backed out of its parking spot and turned east on to Pine Street; Detective Olson lost view of the vehicle at that point. Id. at p. 98.

---

[9] Exhibit 5 is a map of the area surrounding the Wells Fargo parking lot.

Based on the electronic tracking information of the two vehicles, law enforcement, including Officer Gebhard, parked in various locations in order to conduct surveillance.  Id. at p. 28.  Detective Gebhard parked in the information center parking lot.  Id.

At the intersection of Pine and Pioneer, Detective Gebhard saw Wahl commit a traffic infraction by making a wide right-hand turn.  Id. at p. 32. Detective Gebhard testified that Wahl was in the right-hand lane and "as she made the turn, her front driver's side tire of the vehicle crossed over the line into the center lane before drifting back to the outside lane."  Id. at pp. 29-30. When the vehicle's front tire crossed over the center line, the front of the Sienna "swayed over the center line briefly before coming back over into the outside lane."  Id. at p. 31.  Detective Gebhard relayed the traffic violation via the live channels to the other law enforcement involved.  Id.

Trooper Chad Gamber, an officer with the South Dakota Highway Patrol, upon hearing, via a telecommunication app on his phone, that Wahl "made an improper right-hand turn onto Pioneer Way from Pine Street," conducted a stop of the Sienna in the Ace Hardware parking lot in Lead.  Id. at pp. 47-49 & 60; Exhibit 1.[10]  Trooper Gamber did not observe the traffic violation.

Trooper Gamber approached the vehicle, informed Wahl that she was being stopped due to making an improper right turn and told her she was going to receive a warning for traffic violation.  Id. at pp. 52 & 61.  Trooper Stuart Griffith, a police service dog handler with South Dakota Highway Patrol,

---

[10] Exhibit 1 is the video from Trooper Gamber's dashcam.

and his canine Sem arrived on scene "approximately fifteen seconds after [Trooper Gamber] stopped Ms. Wahl." Id. at p. 61.  Trooper Griffith was on the live channel and heard the announcement that "the target vehicle, made an improper, illegal turn somewhere in Deadwood." Id. at pp. 71-72.

Trooper Gamber asked Wahl to come to his patrol vehicle; Wahl complied and was sitting in front seat, unrestrained.  Id. at p. 53.  While Wahl was inside the patrol vehicle, Trooper Gamber was working on the paperwork to issue a warning and completing a records checks of Wahl's driver's license and the vehicle's license plate.  Id.  Trooper Gamber asked Wahl a series of questioning, including if she had been drinking, where she worked, if she won any money gambling, and if she had ever been arrested.  Id. at p. 62.  Trooper Gamber testified that those questions did not delay the stop as he is able to "talk and type at the same time." Id. at p. 63.  The court finds Trooper Gamber's testimony to be credible.

While in the patrol vehicle, Wahl appeared to be visibly nervous.  Id. at p. 54.  Trooper Gamber observed Wahl's artery in her neck violently pounding.[11]  Exhibit 7.[12]  Trooper Gamber testified that, in his experience, when people learn they are receiving a warning, their nervous energy dissipates; however, Wahl's nervousness did not dissipate, rather "it actually increased."  (Doc. 44, p. 56).

---

[11] Trooper Gamber testified that his only medical training was anatomy in high school.  (Doc. 44, p. 63).
[12] Exhibit 7 is a video of the artery in Wahl's neck.  Trooper Gamber testified he took this video as he felt that the artery in Wahl's neck was abnormal.  (Doc. 44, p. 54).

7

Trooper Gamber was completing actions required to issue a traffic warning ticket while Trooper Griffth deployed Sem, his police service dog, to sniff the exterior of the vehicle.  Id. at p. 57; see Exhibit 1.[13]  Trooper Gamber testified that while Sem was conducting the sniff search, Wahl "was intently observing him and his dog, almost to the point where it felt like [Trooper Gamber] was invisible."  Id.  Trooper Gamber did not inform Wahl that Trooper Griffith was going to have Sem conduct a sniff search.  Id. at p. 63.

Trooper Griffith has been a dog handler with Sem since 2018.  Id. at p. 69.  Trooper Griffith testified[14] that he and Sem are trained and certified together as a team.  Id. at p. 84.  The duo completed initial training, maintenance training, which is approximately 16 hours per month, and annual recertification.  Id.  Trooper Griffith's performance, Sem's performance, and their performance as a team is evaluated by a narcotics detector judge.  Id.  Sem is trained to detect marijuana, Psilocybin mushrooms, heroin, cocaine, methamphetamine, MDMA or ecstasy, and derivatives on the base odors.  Id. at p. 72.  As of October 27, 2022, Trooper Griffith and Sem were certified by the State of South Dakota.  Id. at p. 87.

Trooper Griffith testified that Sem is a passive indicator, and in his experience with him, Sem usually indicates by sitting or lying down.  Id. at p. 78.  Trooper Griffith explained that an indication is trained behavior, it is the "trained final response where the dog thinks he's identified the source of the

_____

[13] At approximately minute 7:50 of Exhibit 1, audio of the printer printing off the warning can be heard.  Id. at p. 56.
[14] The court finds Trooper Griffith's testimony to be credible.

odor that he's hunting for." Id. at p. 78. Trooper Griffith has deployed Sem "hundreds" of times. Id. at p. 85.

In this case, Sem alerted by having "intensified, focused sniffing at the seams of the vehicle" and indicated by sitting down at the rear passenger's side of the vehicle. Id. at pp. 83-84. After Sem indicated, Trooper Griffith put Sem back into his patrol vehicle. Id. at p. 81.

After Sem indicated, a search of the Sienna was completed. Trooper Griffith testified that he was "the primary person searching the vehicle." Id. at p. 81. Trooper Griffith located a bag containing about an ounce of cocaine and an ounce of methamphetamine.[15] Id. at p. 81. Trooper Gamber testified that he performed "very little" of the search of the vehicle; he found "a plastic baggie with some rubber gloves in it. . . . And then there was a blue snort straw that was near the rear of the center console," which is "typically how one ingests their drugs." Id. at p. 58. Based on the search of the vehicle, Wahl was placed under arrest. Id. at p. 59.

Law enforcement also located and seized a mobile telephone. At some point later, Detective Olson collected Wahl's cellphone from on-scene officers. Id. at p. 99. Detective Olson prepared a search warrant for the contents of the cell phone based on the evidence that was found in the vehicle. Id. On October 18, 2022, the search warrant was authorized by a state court judge

---

[15] The substances were field test positive for meth and cocaine and later they were submitted for lab testing; Trooper Griffith testified that he has not yet seen the results of the lab test. (Doc. 44, p. 82).

and filed under seal.  Id. at p. 100; see Exhibit 3.[16]  On November 1, 2022, Detective Olson authored and obtained a search warrant for Wahl's residence and vehicle.  Id. at p. 102; see Exhibit 6.[17]  The search warrant application included information regarding the October 17, 2022, traffic stop and evidence gathered from Wahl's cellphone.

## DISCUSSION

In a criminal case, a defendant may move to suppress the use of evidence at trial that she believes was obtained in violation of the Fourth Amendment, including any "fruit" derived from that evidence.  Wong Sun v. United States, 371 U.S. 471, 484–86 (1963).  Such evidence is suppressed only when the Court finds: (1) "the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct," and (2) "the exclusionary sanction is appropriately imposed in a particular case."  United States v. Leon, 468 U.S. 897, 906–07 (1984).

Wahl states "[l]aw enforcement lacked reasonable suspicion of criminal activity to conduct a traffic stop of Jenifer Wahl's vehicle on October 17, 2022. The evidence obtained as a result of that stop was obtained in violation of Ms. Wahl's Fourth Amendment right to be free from unreasonable search and seizure and should be suppressed.  That evidence was relied upon in an

---

[16] Exhibit 3 contains the "affidavit in support of search warrant, the search warrant, the return for the search warrant, and the seal order for the search warrant for Ms. Wahl's cellphone from the traffic stop."  Id. at p. 100.
[17] Exhibit 6 contains "[a]n affidavit in support of the search warrant for Ms. Wahl's residence and vehicle. The search warrant signed by the Judge in state court. Evidence and inventory return, and seal order from state court."  Id. at p. 102.

affidavits used to obtain search warrants of Jenifer Wahl's telephone and residence. All evidence obtained during the subsequent search of Ms. Wahl's telephone and residence is fruit of the poisonous tree and should also be suppressed." (Doc. 51, p. 1). The court will address each argument separately.

## I.      Reasonable Suspicion Existed to Stop the Vehicle

Wahl asserts "Trooper Gamber did not have reasonable suspicion to stop Ms. Wahl's vehicle as he did not witness a violation of the law and did not receive credible information from another law enforcement office[r] of a violation." (Doc. 51, p. 7).

The Fourth Amendment of the U.S. Constitution provides the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest. . . . As such, a traffic stop is governed by the principles of Terry v. Ohio . . . ." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984); Terry v. Ohio, 392 U.S. 1 (1968)). The constitutional analysis under Terry is two-part: (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Wahl does not argue that the scope of the traffic stop was unreasonable; thus, the only issue was whether the stop was justified at its inception.

To be valid pursuant to the Fourth Amendment, a traffic stop, at its inception, "must be supported by reasonable suspicion or probable cause." United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008) (internal citations omitted).  A law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.  United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994); Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (describing reasonable suspicion as "a minimal level of objective justification").

In considering whether reasonable suspicion exists, the court must consider "the totality of [the] circumstances," and the "whole picture must be taken into account."  United States v. Thomas, 992 F.2d 201, 203 (8th Cir. 1993) (citing United States v. Wantland, 754 F.2d 268, 270 (8th Cir. 1985)) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)); United States v. Arvizu, 534 U.S. 266, 274 (2002) (rejecting a "divide-and-conquer analysis" where a court concludes each individual fact is "entitled to 'no weight' " because it is "readily susceptible to an innocent explanation").  "An officer may have reasonable suspicion to conduct a Terry stop based on a combination of factors even where no single factor, considered alone, would justify a stop." United States v. Quinn, 812 F.3d 694, 698 (8th Cir. 2016) (citing Terry, 392 U.S. at 22).

The totality of the circumstances also involves "commonsense judgments and inferences about human behavior," Wardlow, 528 U.S. at 125, as well as

12

inferences the officer may draw based on his "experience and specialized training," <u>Arvizu</u>, 534 U.S. at 273.  Even entirely innocent behaviors may establish reasonable suspicion in some circumstances.  <u>United States v Sokolow</u>, 490 U.S. 1, 9-10 (1989); <u>see</u> <u>Navarette v. California</u>, 572 U.S. 393, 403 (2014) (noting that an officer "need not rule out the possibility of innocent conduct").

"When multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication." <u>United States v. Robinson</u>, 664 F.3d 701, 703 (8th Cir. 2011); <u>United States v. Edwards</u>, 891 F.3d 708, 711-12 (8th Cir. 2018); <u>United States v. Gonzales</u>, 220 F.3d 922, 925 (8th Cir. 2000).

The requirement that there is some degree of communication "serves to distinguish between officers functioning as a 'search team' and officers acting as independent actors who merely happen to be investigating the same subject." <u>United States v. Gillette</u>, 245 F.3d 1032, 1034 (8th Cir.).  The Eighth Circuit Court of Appeals has "never required that all the relevant collective knowledge of the team be communicated to the officer who made the stop, the arrest, or the search at issue.  <u>Robinson</u>, 664 F.3d at 703-04 (citing <u>United States v. Winters</u>, 491 F.3d 918, 920-21 (8th Cir. 2007); <u>Gillette</u>, 245 F.3d at 1034); <u>see</u> <u>United States v. Jacobsen</u>, 391 F.3d 904 (8th Cir. 2004) (holding the patrol officer himself need not know the specific facts that caused the stop;

rather, the officer need only rely upon an order that is founded on reasonable suspicion); United States v. Rowe, 878 F.3d 623, 628 (8th Cir. 2017).

**A. Traffic Violations**

Wahl states "Detective Gebhard is the only investigating agent to claim he observed Ms. Wahl commit a violation of the law.  Trooper Gamber and Detective Olson both testified that they did not observe any violations of the law by Ms. Wahl.  Detective Gebhard claims Ms. Wahl made in improper right-hand turn when turning from Pine Street to Pioneer Way.  However, Detective Gebhard's testimony is not reliable.  He claims to have witnessed this violation of the law while in a parking lot on the other side of the intersection of Pine Street and Pioneer Way.  Exhibit 5A shows that Pioneer Way has several lanes of traffic that separated Detective Gebhard from where Ms. Wahl's vehicle turned as well as a sidewalk between the roadway and the parking lot where Detective Gebhard was located.  Detective Gebhard was not [] on the roadway near Ms. Wahl's vehicle where he would have been able to clearly observe her make this turn.  . . .  The Government's witnesses presented minimal testimony and no records to corroborate the level of communication that took place between investigating agents.  This lack of communication, and documentation of that communication, should bar the Government from relying on the collective knowledge of other law enforcement." (Doc. 51, pp. 7-8).

It is correct that Trooper Gamber and Detective Olson testified that they did not observe Wahl commit any traffic violations.  Detective Gebhard testified that he observed Wahl commit a traffic violation.

14

Detective Gebhard testified that he parked his vehicle in the information center parking lot in order to conduct surveillance.  Id. at p. 28.  At the intersection of Pine and Pioneer, Detective Gebhard saw Wahl approach the intersection and turn south onto Pioneer Way.  Id. at p. 29.  Detective Gebhard testified Wahl "was in the right-hand lane.  As she made the turn, the front driver's side tire of the vehicle crossed over the line into the center lane before drifting back to the outside line."  Id. at pp. 29-30.  When the vehicle's front tire crossed over the center line, the front of the vehicle "swayed over the center line briefly before coming back over into the outside lane."  Id. at p. 31. Detective Gebhard testified that in Exhibit 5, there is a vehicle headed south on Pioneer; if the vehicle had been in that location at the time Wahl made her turn, it could have potentially caused an accident, when Wahl's front tire crossed the center line.  Id. at pp. 30-31.  Detective Gebhard testified that he relayed the traffic violation via the live channels to the other law enforcement involved in the investigative team.  Id.  Trooper Chad Gamber, upon hearing, via a telecommunication app on his phone, that Wahl committed a traffic violation, conducted a stop of the Sienna .  Id. at pp. 47-49 & 60.  Trooper Griffth testified that he recalls hearing, via the live channels, that the Sienna made an illegal turn.  Id. at p. 71

The court finds Officer Gebhard's testimony to be credible.  The court finds that from Officer Gebhard's vantage point at the information center parking lot, he would have been able to see Wahl commit the traffic violation at the intersection of Pine and Pioneer.

15

Probable cause to stop the Toyota Sienna existed based on the violation of the traffic law. The Eighth Circuit Court of Appeals has been clear: when an officer observes even a minor traffic violation, there is probable cause to search the vehicle, even if the traffic stop is a pretext for another investigation. United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted). Thus, the fact that law enforcement was looking for a reason to stop Wahl is irrelevant.

The Eighth Circuit has recognized that in South Dakota, crossing the fog line one time constitutes a violation of SDCL 32-26-6. United States v. Herrera Martinez, 354 F.3d 932 (8th Cir. 2004), *vacated on other grounds*, 549 U.S. 1164 (2007). In State v. Hett, 834 N.W.2d 317, 323 (S.D. 2013), the Supreme Court of South Dakota held that an officer had reasonable suspicion that a defendant violated § 32-26-6 when the officer saw the defendant cross over the fog line "by at least a tire width," and it was practicable for the defendant to remain entirely within his lane. See United States v. Spaid, 3:16-CR-30176. 2017 WL 4863080, *3 (D.S.D. October 17, 2017).

The evidence presented established that Wahl violated SDCL 32-26-6 as her vehicle's front driver's side tire crossed over the line into the center lane before drifting back to the outside lane.

Under the collective knowledge doctrine, Officer Gamber was able to rely on the probable cause relayed to him by Detective Gebhard via the live channels. See Robinson, 664 F.3d at 703. The court finds that the United

16

States presented ample testimony regarding the communication via the live channels between the officers.

The court finds that there was sufficient, reliable evidence that Wahl was observed making an illegal right-hand turn and such observations were passed onto Trooper Gamber before he initiated the traffic stop; therefore, the evidence obtained as a direct result of this stop need not be suppressed.

### B. Investigation

Applying the relevant legal principles to the facts adduced at the hearing, the United States clearly established that reasonable suspicion existed to stop Wahl's vehicle on October 17, 2022. As detailed above in the facts section, law enforcement was aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime, namely distribution of a controlled substance, was being committed. The court finds the testimony regarding the investigation into Wahl to be credible.

In early 2022, based on information from sources of information that Vu was a source of supply for illegal drugs, specifically methamphetamine, UNET obtained a search warrant for Vu's Facebook. Id. at pp. 10 & 13-15. Within Vu's Facebook, Detective Gebhard observed a conversation, starting since at least January 7, 2022, between Vu and Wahl that was indicative of the distribution of illegal drugs. Id. at pp. 14-15. In the messages, they discussed meeting up, cutting product, and payments. Id. at pp. 15-24. At one point in the conversation, Wahl asked Vu for a price break, Vu referred to her "bench"

being off, and the two discussed other topics indicative of drug activity.  Id. at p. 24.

In June 2022, Detective Gebhard told Detective Olson that he had noticed multiple conversations between Vu and Wahl.  Id. at pp. 25 & 90. Based on the conversation, Detective Olson began his investigation into Wahl, which led to him seeking a search warrant for Wahl's Facebook account.  In August 2022, Detective Olson received the requested information from Facebook.  Id.  Upon review of her Facebook account, Detective Olson observed seven or eight communications that were very apparent that the nature of those conversations had to deal with the sale and distribution of drugs.  Id. at p. 91.  In those conversations, Detective Olson believed that Wahl was the one selling cocaine, methamphetamine, and marijuana.  Id.

Based on the information that was shared by Detective Gebhard and the information learned from Wahl's Facebook account, Detective Olson applied for a search warrant, from the State of South Dakota, for an electronic tracking device to be placed on her vehicle; the search warrant was granted, and the tracking device was placed.  Id. at p. 93.

On October 17, 2022, agents became aware that Vu's vehicle was traveling to Deadwood and Wahl's vehicle was "en route from Lead towards Deadwood."  Id. at pp. 26 & 93.  The tracking device on Vu and Wahl's vehicle indicated they were in the Super 8's parking lot at approximately 10:16 a.m. Id. at p. 36.

Law enforcement officers involved in this case were briefed on information regarding the individuals involved, the vehicles associated, where the individuals may live, where they may go, and the plan of whether law enforcement was going to stop Wahl's vehicle based off the totality of the investigation or if law enforcement was to develop reasonable suspicion to stop the vehicle. Id. at pp. 33 & 48.

Prior to the Sienna committing the traffic infraction, based on totality of the circumstances, Olson and Gebhard had reasonable suspicion to believe that Wahl was committing the crime of distribution of a controlled substance. Officers were told to look for an infraction to create independent probable cause to stop the Sienna, but they should stop the Sienna regardless. Id. at p. 33. Because the stop of Wahl's vehicle was founded on reasonable suspicion, the stop was valid independent of the traffic violation.

The court agrees with Wahl's assertion that "law enforcement's electronic tracking showed two vehicles of interest were both in the Super 8 parking lot at 10:16. No law enforcement agent actually observed Ms. Wahl drive to the Super 8 parking lot and no law enforcement agent observed her meet or interact with Amanda Vu in anyway. No law enforcement agent saw her drive to the area of the Wells Fargo. Detective Olson did not begin surveilling Ms. Wahl's vehicle until noon or 12:30. Investigating agents cannot speak with any certainty as to Ms. Wahl's locations or actions prior to this time." (Doc. 51, p. 7). However, certainty is not required to establish reasonable suspicion. It is enough that law enforcement was aware of particularized, objective facts

19

which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime, namely distribution of a controlled substance, was being committed.  United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994).  Reasonable suspicion for stopping the vehicle existed on the basis of the drug investigation alone.

## II.    Subsequent searches

Wahl argues "[e]vidence obtained from the stop of Ms. Wahl's vehicle on October 17, 2022, was included in the applications for search warrants used to obtain both the search warrant for Ms. Wahl's cell phone and the search warrant for her home.  Accordingly, any evidence obtained through those warrants should also be suppressed." (Doc. 51, p. 10).  Because the court finds that stop of Ms. Wahl's vehicle on October 17, 2022, was lawful, the exclusionary rule does not apply, and evidence need not be suppressed.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress (Doc. 32) be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require *de novo* review by the

20

District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

  DATED this 13th of December, 2023.

        BY THE COURT:

        _____
        DANETA WOLLMANN
        United States Magistrate Judge